# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 25, 2001 Session

## STATE OF TENNESSEE v. DERRICK BRYANT

### Appeal from the Criminal Court for Hamblen County
### No. 98-CR-073    James Edward Beckner, Judge

---

### No. E2000-01835-CCA-MR3-CD
### Oct6ober 9, 2001

---

The defendant, Derrick Bryant, was convicted of first degree premeditated murder. See Tenn. Code Ann. § 39-13-202(a)(1). The jury sentenced him to life imprisonment with the possibility of parole. In this appeal of right, the defendant asserts that the trial court erred by (1) failing to suppress his confession; (2) denying his last requested continuance; (3) accepting transfer of the case from the juvenile court; and (4) excluding evidence of the victim's reputation for violence. The judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

D. Clifton Barnes, Morristown, Tennessee (on appeal), and Mark S. Stapleton, Rogersville, Tennessee (at trial), for the appellant, Derrick Bryant.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Berkeley Bell, District Attorney General; John Dugger, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On February 12, 1998, at approximately 3:30 a.m., the defendant reported a burglary to the Hamblen County Sheriff's Department. Lieutenant Mike Kitts was dispatched to meet the defendant at Roe Junction Church. The defendant told Lieutenant Kitts that while he and his father were asleep, someone had broken into their residence. The defendant stated that while he had successfully fled the residence, he feared for the life of his father. In the residence, Lieutenant Kitts and another officer found the body of the victim, Randall Bryant, who had been shot once in the back of the head while sleeping.

After searching the Bryant home, Lieutenant Kitts took a recorded statement from the defendant. The defendant, who was 16 years old at the time, told the deputy that he and his father went to bed sometime between 9:00 and 10:30 p.m. He claimed that between midnight and 1:30 a.m., he heard someone enter the house and walk through all the upstairs rooms. The defendant said that when he heard a gunshot, he went upstairs and encountered the intruder "running through the hall with a black full face ski mask." The defendant claimed that he found the victim's cellular phone and truck keys, ran outside to the victim's truck, and drove away. He contended that he was chased by the intruder, who had an automobile. The defendant told Lieutenant Kitts that he eluded his pursuer by hiding with his headlights off on a dead-end street. When the defendant telephoned his grandmother, she instructed him to drive to her residence. He then contacted police, who arranged to meet him at the church.

Chief Deputy Larry Samsel, of the Hamblen County Sheriff's Department, investigated the crime scene. He found a nine millimeter shell casing on the night stand next to the victim's bed and found a permit that had been issued to the victim for a nine millimeter handgun in the defendant's bathroom commode. The permit had been cut into small pieces. A pair of scissors lay on a nearby counter. Deputy Samsel located a nine millimeter bullet on a speaker in the defendant's bedroom. While the deputy found another of the victim's handguns, he was unable to locate the nine millimeter weapon.

After he was taken into custody and advised of his Miranda rights, the defendant confessed to the crime in a second statement to police:

When [my girlfriend and I] got [home] my dad walked outside. My girlfriend left. My dad told me to get my ass in the damn garage. He started fussing and took hi[s] belt off . . . [and] hit me 3 or 4 times on the back of my thighs. He told me I stole his tools and said I was a damn thief, but I didn't steal his tools. He told me if he caught me on the telephone he was going to beat my ass. I went to my room and shut the door. I was pretty upset. About 30 minutes [passed] and he came back down to my room. He opened the door . . . [and] said your [sic] getting another damn beating. He started hitting my back with the buckle end of the belt. He went back upstairs and told me not to come out of my room. This was about 8:00 or 9:00. [Later,] I was thirsty and wanted something to eat. I went upstairs . . . and dad was sitting in the recliner. He had one of his guns cleaning it and pointed it at me and told me to get back into my room. . . . I went back to my room. I heard him later on go to bed. I went back upstairs to get something to drink. He wasn't asleep. He told me to get my GD ass back into my room. I went back to my room again. I waited about 30 minutes until he was asleep and went back upstairs. I went to the back right side bedroom. I got a gun from the gun rack, it was black, it was bigger than a 38, it wasn't the 45 caliber. Dad keeps all his guns loaded, so I didn't have to load it. The gun was one that had a clip in it. I went to his bedroom, the door was shut. I opened it quietly. The lights were off. I went on the right side of the bed . . . and pointed the

gun at him but I couldn't shoot it. I was nervous, I was so nervous, I was jerking. He was snoring before I shot him. I panicked and ran out of the bedroom. . . .

At trial, the defendant pursued a theory of diminished capacity. He testified that although he was only six when his natural mother died, he recalled that the victim often beat her. The defendant contended that he was not allowed to speak about his mother after her death because the victim "didn't like her." When he did make any reference to his mother, the victim "would take a belt and start wearing [him] out." The defendant testified that during this time, the victim "started drinking[,] . . . getting more abusive[,] . . . doing drugs[, and] . . . getting a violent temper." He recalled that in approximately 1990, the victim began dating Susan Bryant, who moved into the household. The defendant maintained that the victim was physically abusive towards Ms. Bryant and on one occasion pushed her down the stairs. He stated that when he became old enough to drive, Ms. Bryant helped him purchase a car. The defendant remembered that on one morning, after he missed the school bus, the victim first instructed him to drive to school and then changed his mind and said that he would drive the defendant to school on the way to work. The defendant testified that when he insisted on driving himself to school, the victim knocked out the front passenger window with a crowbar. The defendant recalled that on a separate occasion, the victim damaged one of the vehicle's rear quarter panels with a crowbar.

The defendant claimed that he was afraid of the victim and remembered that he had seen the victim use a screwdriver to stab a neighbor in the shoulder. He also recalled that the victim had fired a gun out of a kitchen window towards the same neighbor's residence. When the defendant inquired about the shooting, the victim responded that he was "going to shoot [the] power meter off [his neighbor's] house" because he "was playing his stereo too loud." The defendant remembered that on another occasion, when he was approximately eleven years old, he burned a hamburger patty; afterward, the victim angrily threw a skillet across the kitchen, splashing the defendant with grease and leaving permanent scars on his chest and leg. When 15 years of age, the defendant reported to the police that the victim was using marijuana. He recalled that when the police arrived at the residence, the victim surrendered his marijuana but was not arrested. The defendant claimed that the police drove him to their department, where he was later picked up by Susan Bryant. The defendant and Ms. Bryant packed and drove to North Carolina. Along the way, they called the victim, who warned that he would hunt them down and kill them if they did not return. Upon their return, he stayed for a period of time at the Youth Emergency Shelter before moving back into the victim's residence. Although the victim was ordered to undergo counseling, he did not. To the best of the defendant's recollection, Ms. Bryant moved out of the victim's home in the late summer or early fall of 1996.

The defendant testified that on the day of the shooting, the victim accused him of having stolen his tools. He claimed that when he denied the accusation, the victim required him to remove his clothing and then "beat" him with a belt. The defendant stated that afterward, he was sent to his room and prohibited from speaking on the telephone or going outdoors. He testified that later that night, he went upstairs to get something to eat and found the victim sitting in his recliner and cleaning a gun. The defendant stated that the victim pointed the gun at him, cocked the hammer, and

ordered him to go back downstairs. He stated that afterward, the victim turned off the television and retired to his bedroom. When the defendant tried to go upstairs again, the victim again instructed him to return to his room. According to the defendant, he returned to his room and, and after "thinking about all the times that [the victim] was abusive," became scared, upset, frustrated, and confused. The defendant testified that he retrieved a gun from a back upstairs bedroom and proceeded to the victim's bedroom. He described himself as nervous and shaky when he initially pointed the gun at the victim. After pointing the gun at the victim a second time, however, he "just shot him."

On cross-examination, the defendant claimed he was unaware that the victim had a will. He denied that the victim had informed him that he would receive everything under the terms of the will. He also denied having told one of his teachers that he planned to kill the victim in his sleep. The defendant contended that he did not know whether he had told Dr. Panella, a defense expert, that the victim had drunk two bottles of Everclear alcohol and smoked marijuana during the evening prior to his death. He acknowledged, however, that the victim's toxicology reports were negative for alcohol and marijuana. When asked whether he intentionally pulled the trigger of the gun, the defendant responded that he "was nervous, and . . . jerked."

Initially, the defendant contends that the trial court erred by denying the motion to suppress his confession. He argues that he is mentally retarded and that his Miranda rights were not explained to him in language that he could understand.

At the suppression hearing, Lieutenant Kitts testified on behalf of the state that authorities were notified of the crime by a 911 call placed by the defendant. He recalled that when he and the defendant arrived at the scene, the defendant remained outside while he went into the house to investigate. After about one-half hour, Lieutenant Kitts took a recorded statement from the defendant and completed an offense report. Because of cold weather, he and the defendant sat in the front seat of his cruiser. The statement and report took approximately 15 to 20 minutes to complete. Afterward, Lieutenant Kitts returned to the Bryant residence for another 15 to 20 minutes. Lieutenant Kitts testified that he did not arrest the defendant or otherwise restrain his freedom to leave the scene. Before departing, he told the defendant, who offered to "do anything to help," that the detectives would probably want to speak with him. When he offered the defendant a ride to the station, the defendant accepted. Lieutenant Kitts transported the defendant to the station and left him in a seat near the door at approximately 6:00 a.m.

Mike Hayes, a criminal investigator with the Hamblen County Sheriff's Department, interviewed the defendant at approximately 6:55 a.m. At trial, he testified that he met with the defendant and Deputy Samsel and that prior to questioning, he read the defendant his Miranda rights from a prepared form. The defendant acknowledged that he understood his rights and signed a waiver form. When Detective Hayes asked him about the events of the early morning, the defendant initially provided a statement similar in content to that given to Lieutenant Kitts. When the detective questioned the details of his account and informed the defendant that officers had recovered the remnants of the victim's gun permit from a commode, the defendant confessed to shooting the

victim. Detective Hayes testified that at 7:38 a.m., the defendant repeated his confession so that he could reduce the statement to writing. Because the defendant had difficulty reading the statement, the detective read it aloud to him. The defendant then signed both pages.

During cross-examination by the defense, Detective Hayes acknowledged that he had not ascertained whether the defendant could read or write. He admitted that since the interview with the defendant, he had added a space for a determination of literacy to his standard Miranda form. He testified that while he was aware that the defendant had trouble reading the written statement, he merely inferred that the defendant "couldn't read [his] writing." Detective Hayes recalled that he was unsuccessful in attempting to locate an adult relative of the defendant prior to the interview. He knew that the defendant's mother had died several years earlier and was, at the time, unaware of the defendant's grandmother. While the detective acknowledged that he had instructed the defendant that he "needed to know the truth," it was his opinion that the defendant did not fear him.

Richard Jones, a licensed psychological examiner employed by Cherokee Health Systems, testified on behalf of the defendant. He recalled that he had previously evaluated the defendant in connection with his special education eligibility and status. In October of 1997, when the defendant was 16 years, eight months old, his test scores indicated that he was functioning at the level of a seven- or eight-year-old child in terms of letter word identification and passage comprehension. His broad reading index showed skills in the pre-second- to third-grade range. Previous assessments had yielded similar results. In 1994, when the defendant was 13 years, seven months of age, his full scale IQ was 69, placing him in the "mildly mentally retarded" category. Dr. Jones opined that the defendant would not have been able to read and understand the Miranda form and that he would not have fully understood the form as read to him. On cross-examination by the state, Dr. Jones acknowledged that the defendant would have understood the statements he made to Detective Hayes and would also have understood those statements when they were read back to him. He admitted that he was unaware that the defendant had a driver's license and that he had missed only two questions on the driver's examination. He also admitted that he was unaware that the defendant repaired motorcycles and that he had scored in the 90th percentile on four areas of Hamilton County School Vocational/Technical Education testing.

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order for an accused to effect a waiver, he must be adequately appraised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

Recently, in State v. Blackstock, 19 S.W.3d 200 (Tenn. 2000), our supreme court held that a defendant's mental retardation does not, in and of itself, render a statement unknowing. Rather, our high court determined that mental retardation and other mental deficiencies are factors to be considered in the totality of the circumstances:

> The effect of an accused's mental deficiencies or retardation on the validity of his decision to waive Miranda rights has been considered in numerous cases. Charles C. Marvel, Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession, 8 A.L.R.4th 16 (1981 & Supp. 1999). Mentally retarded individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver. United States v. Murgas, 967 F. Supp. 695, 706 (N.D.N.Y. 1997). As one commentator has suggested, the mentally retarded are "less likely to understand their Miranda rights and the consequences of waiving them, giving rise to concerns about the knowing intelligence of their waivers." Paul T. Hourihan, Earl Washington's Confession: Mental Retardation and the Law of Confessions, 81 Va. L. Rev. 1471, 1492 (1995).

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] so waive, the constitutional rights embraced in the Miranda rubric." Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained. . . .

Id. at 208.

In this instance, the trial court made detailed findings of fact:

> Here the defendant . . . has tested both above the retarded threshold and slightly within it . . . . [O]rdinarily those testings are such that a person would be able to understand and comprehend things explained within a waiver of rights, admonition of rights . . . .

\*       \*       \*

I . . . agree with [the district attorney general] that the recorded statement, the live voice of the defendant that I heard, lends a lot of help to me . . . because . . . . I have the defendant's own voice, his own thinking.

*　　*　　*

That he understood the statement he signed is clear, because they were his words back to him. The officer could not have fabricated all those many details that the defendant gave him; they had to come from the defendant. . . .

The language . . . in the admonition and waiver, is not the best in the world. It's always better if an officer can explain that to any defendant in . . . simpler terms rather than just read it. But, nevertheless, the essence can easily be gained.

The fact that the defendant has been able to do so many other things – If he can get a driver's license and pass a driver's license test, if he does . . . score very high on conceptualizing, visualizing – and that's something that's often very hard for most of us to see how things go together, to picture that before you actually put them together. Those kinds of things belie the conclusion that Mr. Jones has reached . . . along with the fact that if he is retarded, it's very mildly retarded.

The trial court specifically found that the defendant was able to

(1)    "[c]onceptualize time without any difficulty;"
(2)    "[c]onceptualiz[e] well about relating sounds . . . he hears to what actually happens;"
(3)    "articulate and relate what he's hearing, even though he doesn't see it;"
(4)    "understand[] silence;"
(5)    "reason" and "think;" and
(6)    understand "self-protection."

The trial court further observed as follows:

You know whether [the defendant's statement to Lieutenant Kitts is] the truth or, as [the district attorney general] characterizes it[,] . . . a lie, those are articulate, detailed statements of a person that can conceptualize time and space and sounds and self protection and things of a relative high degree of sophistication.

In our view, the record supports the trial court's determination that the defendant's confession was knowing and voluntary. Although testing has indicated that the defendant is mildly retarded, the totality of the circumstances suggest that he is able "to understand the implications of a waiver." Id. The presentence report indicates that he has completed the eleventh grade. The defendant has possessed a valid driver's license and been employed as a construction worker. The trial judge,

relying on the defendant's own recorded voice and words, determined that the defendant understood the statements that he signed. It was defense expert Richard Jones's opinion that the defendant understood his own statements and would have understood his confession when read back to him. The trial court also found that "the essence of [the <u>Miranda</u> rights read to the defendant could] be easily gained." In the context of this finding, the record also demonstrates that the defendant has previous experience with the criminal justice system. In 1997, two delinquency petitions, one alleging underage consumption and driving under the influence, and the other alleging stalking and telephone harassment, were filed against the defendant and adjudicated. In summary, the evidence does not preponderate against the trial court's determination that the confession was knowingly and voluntarily given.

Next, the defendant argues that the trial court erred by failing to continue the trial date in order to allow a psychiatric evaluation for purposes of determining the viability of an insanity defense and his competency to stand trial. In response, the state contends that the record on this issue is inadequate for appellate review.

Although the defendant asserts in his brief that he filed two motions seeking continuance of the trial date, one on October 20, 1998, and one on November 5, 1998, neither motion is contained in the record. There are no transcripts of any hearings on the motions and no orders disposing of the motions. Information contained in a brief is not a part of the record on appeal. <u>See, e.g.</u>, <u>State v. Matthews</u>, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990). It is the duty of the appellant to supply an adequate record for a determination on the merits; because the record is not adequate on this issue, the defendant cannot be granted relief. <u>See</u> <u>State v. Coolidge</u>, 915 S.W.2d 820, 826 (Tenn. Crim. App. 1995), <u>overruled on other grounds by</u> <u>State v. Troutman</u>, 979 S.W.2d 271 (Tenn. 1998).

Furthermore, the grant or denial of a continuance motion rests within the sound discretion of the trial court. Its determination will not be overturned unless there is a clear showing of abuse of that discretion. <u>Woods v. State</u>, 552 S.W.2d 782 (Tenn. Crim. App. 1977); <u>Frazier v. State</u>, 466 S.W.2d 535 (Tenn. Crim. App. 1970). When there has been lack of diligence or neglect on the part of the moving party, the motion for continuance should be overruled. <u>State v. Jefferson</u>, 529 S.W.2d 674 (Tenn. 1975). A reversal is warranted only when the failure to continue results in an unfair trial and a different result "might reasonably have been reached had there been a different disposition of the application for a continuance." <u>Baxter v. State</u>, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973).

The record reflects that on June 8, 1998, the defendant, who had been transferred from juvenile court, was indicted for first degree premeditated murder. On June 17, 1998, along with eight other motions, the defendant filed a motion seeking a court-ordered mental evaluation. On October 12, 1998, the trial court ordered that the defendant be transferred to Cherokee Mental Health System for psychiatric testing and evaluation to determine "if the defense of insanity can be supported; [the presence of] mental disease or defect; and, competency to stand trial." Nearly a month later, on November 9, 1998, the defendant filed the following "Notice Pursuant to Rule 12.2(b):"

-8-

COMES the Defendant, **Derrick Bryant**, by and through counsel, Mark S. Stapleton, and gives notice of their intention to introduce expert testimony relative to the mental condition of the Defendant bearing upon the issue of guilt. This notice filed this day considering the Court, even though a psychologist or psychiatrist cannot evaluate the Defendant until December 2, 1998, has indicated he is going to trial on November 17 and 18 nevertheless. This issue was discussed with this counsel and the Court on November 5, 1998.

The record indicates that the trial court was responsive to the defendant's request for a court-ordered psychiatric evaluation. There was ample time for the defendant to have obtained one. Perhaps most telling in this regard is the defense argument that "the trial court erred in refusing to grant an additional continuance, even considering trial counsel's delay in obtaining the evaluation." In our view, the record simply does not support the claim of an abuse of discretion by the trial court. Moreover, the defendant has failed to show that a different result might reasonably have been reached had the trial date been continued. Aside from general information regarding the defendant's IQ and his functioning on various special education assessment tests, the record is devoid of any specific evidence that the defendant lacked the capacity to understand the nature and object of the proceedings or was incapable of consulting with counsel and assisting in his defense. See, e.g., State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991). To the contrary, the defendant provided clear and cogent trial testimony and by all appearances fully understood the nature of the proceeding and his own culpability for the offense. The jury, as was its prerogative, rejected the defense's diminished capacity theory. Even if this issue had not been waived, the defendant would not be entitled to relief.

The defendant next contends that the trial court erred by accepting a transfer from juvenile court. Tennessee Code Annotated section 37-1-134 provides that after a delinquency petition is filed, a child may be treated as an adult in criminal court under the following conditions:

(1) The child was sixteen (16) years or more of age at the time of the alleged conduct, or the child was less than sixteen (16) years of age if such child was charged with the offense of first degree murder, second degree murder, rape, aggravated rape, aggravated robbery, especially aggravated robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping or an attempt to commit any such offenses. The district attorney general may not seek, nor may any child transferred under the provisions of this section receive, a sentence of death for the offense for which the child was transferred;

(2) A hearing on whether the transfer should be made is held in conformity with §§ 37-1-124, 37-1-126 and 37-1-127;

(3) Reasonable notice in writing of the time, place and purpose of the hearing is given to the child and the child's parents, guardian or other custodian at least three (3) days prior to the hearing; and

(4) The court finds that there are reasonable grounds to believe that:

(A) The child committed the delinquent act as alleged;

> (B) The child is not committable to an institution for the mentally retarded or mentally ill; and
>
> (C) The interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a) (Supp. 2000).

After conducting a transfer hearing, the juvenile court made the following findings:

> Based upon the evidence that was presented by the [s]tate, including introduction of the [defendant's] statement; the retrieval of the gun; proof that pieces of a gun permit belonging to the gun . . . [were] in the commode; based upon all of that, the [c]ourt finds that the [s]tate has submitted reasonable grounds that the [defendant] committed the delinquent act of first degree homicide.
>
>        \*       \*       \*
>
> There has been no proof that [the defendant] is committable to an institution for either the mentally retarded or the mentally ill. . . . [H]is performance is higher than that of one who is classified as mildly mentally retarded. . . . [H]e has been described by one of his teachers as being streetwise and knowing quite a few more things than other children his age know.
>
> Further, the [defendant], according to the testimony, has excelled in auto mechanics which was a mainstream course, in that it was a general education course; and he scored ninety for that semester in auto mechanics. He had also beg[u]n an agricultural course and had made a type of welding device.
>
> This was all done during the time that he was in school, right prior to this offense being committed. . . .
>
>        \*       \*       \*
>
> [The defendant] was here twice during 1997, and he received what I think most laypersons would call great deals both times . . . . The victim of the stalking and harassing petition did not ask that [the defendant] be prosecuted for that. The victim was represented by her own . . . counsel. And through negotiations with [the defendant's] counsel, and his father, . . . the parties determined on their own to present to the [c]ourt an agreed order issuing mutual restraining orders against each other.
>
>        \*       \*       \*

Moreover, he was here recently, charged with driving under the influence and underage consumption. . . . And again, [the defendant] was successful in cutting a great deal. The D.U.I. was nollied upon agreement. . . . But he was given the benefit of the doubt and placed on probation, indefinitely, for underage consumption of alcohol. The [c]ourt notes that the terms of his probation included the standard terms of going to school, obeying the authorities, not committing any other crimes.

*     *     *

There are reasonable grounds to show that the community requires that the child be put under legal restraint or discipline.

Initially, the defendant complains that the trial court failed to hold an acceptance hearing prior to his transfer. He concedes, however, that an acceptance hearing by the trial court was not required. See State v. Darden, 12 S.W.3d 455, 459 (Tenn. 2000). He also concedes that he did not file a motion for an acceptance hearing on the ground that the juvenile court judge was a non-lawyer. See Tenn. Code Ann. § 37-1-159(d). In consequence, this issue does not afford the defendant relief.

The defendant also asserts that "there was not sufficient information in juvenile court" to warrant transfer of this case to criminal court. We disagree. At the time of the transfer, there were reasonable grounds to believe that the defendant had committed the alleged act, the premeditated murder of his father. See Tenn. Code Ann. § 37-1-134(4)(A). The state presented proof of, among other things, the defendant's confession to police, the recovery of the murder weapon, and the recovery of the weapon's carry permit from the defendant's commode. There is also a reasonable basis to believe that the defendant is not committable to an institution for the mentally retarded or mentally ill. See Tenn. Code Ann. § 37-1-134(4)(B). Notwithstanding the indications of mild mental retardation, the defendant has apparently lived a relatively normal, mainstreamed life. Finally, given the gravity of the offense, as well as the defendant's prior criminal history, there is a reasonable basis for concluding that the defendant needed to be "put under legal restraint." See Tenn. Code Ann. § 37-1-134(4)(C). The transfer, in our view, was appropriate.

Finally, the defendant asserts that the trial court erred by excluding testimony concerning the victim's reputation for violence. He acknowledges, however, that both he and defense witness Susan Bryant were allowed to testify about the victim's history of violent and aggressive behavior. The defendant does not cite this court to any excluded testimony which should have been admitted. Nor does he provide this court with any argument, authorities, or citations to the record. As a result, the issue has been waived. See Tenn. Ct. Crim. App. 10(b); State v. Price, 46 S.W.3d 785, 825 (Tenn. Crim. App. 2000).

Accordingly, the judgment of the trial court is affirmed.

_____

GARY R. WADE, PRESIDING JUDGE